**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

REGINALD L. PARKER**,**

                                        Petitioner,

        v.                                                                          9:03-CV-0759
                                                                                    (LEK/RFT)

GEORGE B. DUNCAN, Superintendent,
Great Meadow Correctional Facility,

                                        Respondent.

---

**APPEARANCES:**                                    **OF COUNSEL**:

**FOR THE PETITIONER**:

**REGINALD L. PARKER**
Petitioner, *pro se*
97-B-0676
Great Meadow Correctional Facility
Box 51
Comstock, NY 12821

**FOR THE RESPONDENT:**

**HON. ANDREW M. CUOMO**               **MICHAEL G. MCCARTIN, Esq.**
Office of Attorney General             Assistant Attorney General
State of New York
The Capitol
Albany, NY 12224

**LAWRENCE E. KAHN**
**UNITED STATES DISTRICT JUDGE**

---

**MEMORANDUM-DECISION AND ORDER**

**I. BACKGROUND**

                _A.  State Court Proceedings_

        According to the testimony adduced at trial, on the evening of March 20, 1996, Petitioner

Reginald L. Parker, William Blount (a.k.a "YG"), Ihsaan Abdul-Hameed (a.k.a "Justice"),

Denville Waithe (a.k.a "Dred" and "Steve") and two other men identified at trial only by their nicknames "Black" and "Siyout " conceived a plan to rob Gavir Amador, whom the men believed to be a drug dealer who would have a large quantity of drugs and money, at his home in Schenectady, New York.  See Transcript of Trial of (9/18/96) ("Trial Tr.") at 1763-67.  Some time after arriving at Amador's residence, Parker struck Amador in the head with the gun, opening a gash over Amador's eye.  Id. at 720, 1769-70.  The robbers eventually found a stash of drugs, together with between $1,000 and $3,000 in cash.  Id. at 724-25, 1770-71.

After leaving Amador's residence, the group returned to Siyout's apartment, where they split the money and drugs among all participants in the robbery.  Id. at 1029-30.  The group then agreed to rob Philton Green, a drug dealer from whom the men believed they could steal marijuana.  Id. at 1033-34, 1293-94.  Parker, Blount and Abdul-Hameed then drove to the home of Parker's friend, Lynell McQueen, who agreed to assist the trio in robbing Green.  Id. at 1297-99.  On the ride to McQueen's apartment, Parker informed Blount that Parker wanted to be the "gun man" in the robbery of Green and, as a result, Blount provided Parker with the .380 caliber handgun that would be used during that crime.  Id. at 1039-40.

The group then drove to Green's residence on Crane Street in Schenectady.  Id. at 1046, 1298.  During that trip, Parker volunteered that if Green "got out of hand" during the robbery, Parker would "bust," i.e., shoot, Green.  Id. at 1825.  When they arrived at Green's residence, Abdul-Hameed remained in the car at Parker's direction while he, Blount and McQueen approached Green's home.  Id. at 1046-48.  Once inside, Parker pulled out the pistol and he his companions demanded that Green give them his money and drugs.  Id. at 1051-52.  Green then gave the group the money and marijuana he had on his person and also directed the robbers

2

to the rear portion of his apartment where Green kept additional quantities of marijuana.  Id. at

1053-54.  As Blount went to get the marijuana, Green apparently tried to grab the gun from

Parker's hand.  Id. at 1054.  Although Parker and Green struggled briefly, Parker succeeded in

maintaining control of the weapon, and thereafter proceeded to shoot Green multiple times.  Id.

at 1056-58, 1312-14.  Immediately after shooting Green, Parker, Blount and McQueen ran from

the victim's apartment, jumped into the car, and directed Abdul-Hameed to drive away from the

scene.  Id. at 1314-16.  Although Abdul-Hameed had stayed in the car and did not witness the

shooting, he testified at trial that he heard Blount ask Parker why he "bust[ed]" Green, to which

Parker responded: "[he] had to."  Id. at 1827-29.  The group drove from Green's home to an

apartment on Germania Street which at the time was rented by Kimberly Flanders.  When Parker

and his three accomplices arrived at the Germania Street home, they entered the bathroom and

proceeded to split up the proceeds of the fatal robbery of Green.  Id. at 1063-67, 1830.

    After spending the night at Flanders' apartment, Parker and McQueen, together with their

friend Waithe, drove to Gloversville, New York.  Id. at 1319-23.  While in Gloversville, Parker

and McQueen learned that the Schenectady police were looking for the two for questioning in

connection with Green's murder.  Id. at 1329-30.  The two then devised a plan to frame Waithe

for Green's murder.  Id. at 1330.  In furtherance of that scheme, the two falsely told Waithe that

they had learned that law enforcement agents from the Gloversville Police Department had

suspected Waithe of a drive-by shooting in Gloversville and that he should therefore leave town,

thereby causing Waithe to appear guilty of the Green homicide while simultaneously preventing

Waithe from providing the police with his alibi on the night Green was killed.  Id. at 1331-32.

Parker thereafter approached Flanders and offered her $1000.00 to provide him with a false alibi

for the night of the two robberies.  Id. at 1339.

Law enforcement agents eventually apprehended Parker and McQueen and questioned the two about Green's murder.  Id. at 1340-41, 1535-36.  At the time, Parker was read his Miranda warnings and he thereafter agreed to answer questions about the shooting.  Id. at 1537-39. Although he initially denied all knowledge of the robbery and murder of Green, Parker subsequently admitted that he had traveled from Germania Street to Crane Street (the street on which Green resided) and back to Germania Street the night of the murder, however he claimed that he never entered Green's home at that time.[1]  Id. at 1542-43.

As that interview continued, an investigator showed Parker a pair of jeans that had been recovered from Flanders' apartment soon after the murder.  Id. at 1549-51.  After Parker identified the pants as the pair he had worn on the night Green was killed, the investigator then showed Parker the presence of a stain on the jeans which subsequent deoxyribonucleic acid ("DNA") testing established was consistent with Green's blood.  Id. at 1550-51.  Parker was then taken to an interview room at the police station where McQueen was being questioned, where Parker learned that McQueen had provided the police with a written statement in which he admitted to having been present at the murder.  Id. at 1555-56.  Parker then admitted that he had gone to Green's house the evening and night of March 20, 1996 for the purpose of stealing Green's marijuana, but denied shooting Green.  Id. at 1558-59.  At that time, Parker also falsely identified Waithe as the shooter from a photograph shown to Parker by New York State Police

---

[1]  At one point during this questioning, Parker asked the police what could happen if, "hypothetically," he and another person went to a house to do one thing but Parker's companion shot someone.  Trial Tr. at 1547.  The investigator informed Parker that the police would need additional details to provide him with an answer, prompting Parker to declare that the hypothetical situation had not happened.  Id.

Investigator Charles DeLuca.  Id. at 1631-32.

Based upon the foregoing, on June 6, 1996, a Schenectady County grand jury returned Indictment No. 396-35 against Parker.  See Respondent's Appendix on Appeal ("Resp. App.") at RA 10-13 ("Initial Indictment").  That accusatory instrument charged Parker with nine counts arising from the robbery and murder of Green, including "felony murder" in the second degree, robbery, conspiracy, and bribing a witness.[2]

In his defense of the charges against him, Parker retained Terence Kindlon, Esq., who conducted pretrial discovery and filed various pretrial motions on Parker's behalf, including motions to suppress identification testimony as well as Parker's statements to law enforcement agents.  On September 13, 1996, Schenectady County Court Judge Clifford T. Harrigan presided over a combined Wade[3]/Huntley[4] hearing which he had scheduled to address the issues raised in Parker's pretrial omnibus motion.  Subsequent to that hearing, Judge Harrigan issued a Decision and Order in which he found: (1) that "there was no improper conduct on the part of law enforcement officers and the identification procedure was not suggestive or constitutionally

---

[2]  At the time the Initial Indictment was returned, law enforcement agents were unaware of the earlier robbery of Amador.

[3]  United States v. Wade, 388 U.S. 218 (1967).  The purpose of a Wade hearing is to determine whether identification testimony should be suppressed because the manner in which the identification of the suspect was obtained was unduly suggestive.  See Blas v. Herbert, No. 02 Civ.6257, 2003 WL 22480093, at *3 n.2 (S.D.N.Y. Oct. 31, 2003) (citing Wade).

[4]  People v. Huntley, 15 N.Y.2d 72 (1965).  A Huntley hearing is conducted to determine whether a defendant's statements to the police must be suppressed on the grounds that he was subjected to custodial interrogation without the warnings required under Miranda v. Arizona, 384 U.S. 436 (1966).  See Harris v. New York, 202 F.Supp.2d 3, 4 & n.3 (S.D.N.Y. 2001); see also New York's Criminal Procedure Law ("CPL") § 710.

impermissible;" and (2) the statements made by Parker to the police were voluntarily made.  See

People v. Parker, No. 396-35 (Schenectady Cty. Ct. Nov. 14, 1996) at 2-3.  The County Court

therefore denied Parker's suppression motion in all respects.  Id. at 3.

On March 21, 1997, at Parker's arraignment on the Superceding Indictment, Attorney

While the Initial Indictment was pending against Parker, the District Attorney negotiated

a disposition of a related indictment that had been returned against Abdul-Hameed – the driver of

the car which the perpetrators used following Green's murder.  In conjunction with that

agreement, the District Attorney obtained information from Abdul-Hameed concerning the night

Green was killed including information about the Amador robbery.  Trial Tr. at 1159, 1845.

The District Attorney and Waithe thereafter entered into negotiations which culminated in

a plea agreement in which he pled guilty to a Superior Court Information charging him with the

armed robbery of Amador in exchange for an agreed upon sentence of five years imprisonment.

Following that agreement, the prosecutor re-presented to the grand jury the criminal case it had

developed relating to Waithe, Blount and Parker.  That second grand jury, *inter alia*: (1) absolved

Waithe of all charges arising out of the crimes involving Green; (2) indicted Blount for the felony

murder of Green and the robbery of Amador; and (3) returned a 30-count superceding indictment

against Parker.  See, e.g., Resp. App. at RA 29-42 ("Superceding Indictment").

On March 21, 1997, at Parker's arraignment on the Superceding Indictment, Attorney

Kindlon entered into a voluntary disclosure agreement with the District Attorney which enabled

trial counsel to obtain additional discovery not available to him under the discovery requests he

had previously filed in connection with the Initial Indictment.  Resp. App. at RA 52-53.  On May

5, 1997, Kindlon filed a new omnibus motion in which he renewed his request for, *inter alia*, an

order suppressing identification testimony relating to Parker as well as his statements to law

enforcement agents.  Id. at RA 49-51.  The County Court thereafter scheduled a new

Wade/Huntley hearing, however Kindlon and the District Attorney ultimately agreed that all of

the issues that could have been argued at such hearing had already been raised and fully resolved

in the prior hearing before Judge Harrigan.  Id. at RA 16-28.  Therefore, that second suppression

hearing was not held and a jury trial on the charges was scheduled by the court.

Parker was tried before a jury on the charges in Schenectady County Court with County

Court Judge Guy P. Tomlinson presiding.  During the course of that trial, Parker's accomplices

implicated Parker in the robbery and homicide of Green as well as the robbery of Amador.  See

Trial Tr. at 1019-25, 1047-58; 1308-15, 1766-72, 1822-29.  Their testimony was corroborated by

the testimony of both Flanders and Heather Fournier (an acquaintance of the perpetrators), as

well as New York State Police Investigator Dennis J. Moessner, who had questioned Parker

about his involvement in the crimes.

The jury began its deliberations on September 30, 1997.  Id. at 2272.  During the course

of those deliberations, Judge Tomlinson responded to several requests of the jury, which included

a request that the court re-instruct the jury members as to the elements of the charges brought

against Parker, as well as the reading back of certain testimony provided at trial.  Id. at 2272-318.

The jury thereafter returned a unanimous verdict in which it found Parker guilty of numerous

charges returned against him in the Superceding Indictment, including the top count of first

degree murder.  Id. at 2318-21.

On November 13, 1997, Parker appeared before Judge Tomlinson for sentencing.  At that

proceeding, the County Court sentenced Parker to a term of life imprisonment without the

possibility of parole on the first degree murder conviction, and lesser, concurrent sentences on

the other charges related to the Green homicide.  See Transcript of Sentencing of Reginald Parker (11/13/97) at 33-36.  Judge Tomlinson also sentenced Parker to a term of twelve and one-half to twenty five years imprisonment on his conviction on the charge in the Superceding Indictment which charged Parker with the first degree robbery of Amador.  Id. at 36.  That sentence, as well as lesser, concurrent sentences imposed on Parker in light of his convictions on other charges arising out of the robbery of Amador, was ordered to run consecutive to the sentences imposed on Parker which related to Green's murder.  Id. at 37.  Judge Tomlinson also sentenced Parker to a term of one and one third to four years imprisonment on the final count in the Superceding Indictment, which charged Parker with fourth degree conspiracy, which sentence was ordered to run consecutive to all other sentences imposed on him by the court.  Id. at 37-38.

Parker appealed his conviction to the New York State Supreme Court, Appellate Division, Third Department.  In that appeal, Parker's appellate counsel argued that: (1) the County Court's failure to obtain Parker's consent to the waiving of a second Wade/Huntley hearing constituted reversible error; (2) testimony elicited by the prosecutor from a police officer during Parker's trial required reversal of the convictions; (3) the sentencing procedures utilized by the District Attorney deprived Parker of his right to equal protection of the law; and (4) the sentence imposed on Parker on his first degree murder conviction was both harsh and excessive.  See Appellant's Brief on Appeal (9/27/00).  Parker then filed a supplemental *pro se* appellate brief in support of his appeal in which he claimed that: (1) he received the ineffective assistance of trial counsel; and (2) he was deprived of his right to be present at a critical stage of his criminal trial.  See Supplemental *Pro Se* Appellate Brief  ("Supplemental Br.").  The District Attorney opposed that appeal, and on January 10, 2002, the Third Department denied Parker's

8

appeal. See People v. Parker, 290 A.D.2d 650 (N.Y. App. Div., 3d Dep't. 2002). On March 27, 2002, New York's Court of Appeals denied his application for leave to appeal to that court. See People v. Parker, 97 N.Y.2d 759 (2002), recon. denied People v. Parker, 98 N.Y.2d 679 (2002).

### B. Proceedings in This Court

Petitioner filed a Petition for a writ of habeas corpus, on June 19, 2003. See Dkt. No. 1. In his Petition, Parker claims that: (1) he was denied the effective assistance of trial counsel; and (2) he was deprived of his right to be present at all material stages of his trial. See Pet. (Dkt. No. 1), Grounds One, Two. By Order filed July 10, 2003, this Court directed Parker to pay the filing fee required for this action and ordered the Respondent to file his response to the Petition. See Dkt. No. 3. On September 25, 2003, the Office of the Attorney General for the State of New York, acting on Respondent's behalf, filed an Answer in response to Parker's Petition, together with a memorandum of law in opposition to that application (Dkt. No. 7).

In an application filed on October 6, 2003, Parker sought permission to file "supplemental reply papers in response to opposition." See Dkt. No. 8. Parker reiterated that request in a letter addressed to the Court filed on October 31, 2003. See Dkt. No. 10. Parker was thereafter granted permission to file a Traverse, not exceeding twenty (20) pages in length, and on December 3, 2003, Petitioner filed a Traverse in this action, which, in addition to offering arguments in support of the claims raised in his Petition, purports to assert numerous new theories in support of his application for federal habeas relief. See Traverse (Dkt. No. 11).

## II. DISCUSSION

### A. Claims Asserted for the First Time in Traverse

In his Traverse, Parker asserts, for the first time, his claims that: (1) the verdict was

against the weight of the evidence, Traverse (Dkt. No. 11) at 2; (2) the incriminating testimony of

the co-defendants was not sufficiently corroborated thereby rendering same insufficient as a

matter of law to support the conviction, id. at 3; (3) the jury's verdict was inconsistent, id. at 4;

(4) law enforcement agents never informed Parker of his Miranda rights before questioning him

about the crimes, id. at 7-8; (5) the prosecutor knowingly elicited perjurious testimony, id. at 9;

(6) he was wrongfully denied his right to testify before the grand juries that returned the Initial

and Superceding Indictments, id. at 10; (7) his conviction was the result of an "unreasonable"

jury verdict and "insufficient, contradictive [sic] and false evidence," id. at 12; and (8) the

County Court wrongfully failed to provide the jury with curative instructions after the prosecutor

engaged in misconduct at Parker's trial, id. at 15.

     Nowhere in his Petition did Parker raise any of the foregoing claims.  See Pet. (Dkt. No.

1).[5]  Furthermore, in requesting permission to file his Traverse, Parker did not indicate that he

wished to assert any new or additional claims in this proceeding.  To the contrary, Petitioner

argued that his Traverse would:

> substantiate his claims according to issues raised in
> the state court, and according to the issue [sic]
> raised in the petition as they relate to the issues
> raised in state court in [sic] which the respondent is
> aware of.

See Aff. in Support of Motion to File Reply (10/2/03) (Dkt. No. 8) at ¶ 6; see also Dkt. No. 10 at

3 (Petitioner requesting permission to file a Traverse in excess of ten pages so that he could

submit argument and supporting facts relating to claims asserted in his Petition).  Significantly,

during the over four (4) years that this action has been pending, Parker never filed any motion to

---

[5] Parker did not file any supporting memorandum of law along with his Petition.

amend his habeas petition to assert any of the eight (8) new claims he now seeks to raise through his Traverse.[6]

Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts provides, in part, that "**[t]he petition** must . . . specify all grounds for relief available to the petitioner."  See Rule 2(c)(1) of the Rules Governing Section 2254 Cases in the United States District Courts (emphasis added).  In light of this Rule, it has been recognized that a traverse is not the proper pleading in which to raise additional grounds for habeas relief.  See Haupt v. Moore, No. 4:03 CV 1438MLM, 2005 WL 1518265, at *2 n.3 (E.D.Mo. June 24, 2005) (quoting Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994)).  Claims, therefore, that are raised for the first time in such a pleading are not properly considered by the court.  Haupt, 2005 WL 1518265, at *2 n.3; see also Simpson v. United States, No. 5:03-CV-691, 2005 WL 3159657 (N.D.N.Y. Nov. 25, 2005) (Scullin, C.J.) (declining to consider habeas claims "raised for the first time in [Petitioner's] Traverse").

In light of the foregoing, the Court finds that Parker did not properly raise the claims asserted for the first time in his Traverse, and, therefore, those claims are denied.[7]

---

[6] None of the above-referenced claims were raised by Parker in his state court appeal.  See App. Br. at 1-39; Supplemental Br. at 1-40.  Although Parker alludes to certain theories – such as his claim that the testimony of the co-defendants was not sufficiently corroborated – in his Supplemental *Pro Se* Appellate Brief (see Supplemental Br. at 5-6), those claims were asserted by Parker therein as support for his claim that his attorney rendered ineffective assistance by failing to lodge appropriate objections during the course of Parker's trial; Petitioner never raised any of the above-cited claims as separate, independent arguments in support of his claim for appellate relief.

[7] Petitioner's failure to exhaust his newly asserted claims, as well as the one year limitations period imposed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), would also appear to impose significant procedural hurdles to any consideration of the merits of the claims he has raised for the first time in his Traverse.

*B.  Standard of Review Applicable to Parker's Claims*

Under AEDPA, a federal court may award habeas corpus relief with respect to a claim adjudicated on the merits in state court only if the adjudication of the claim: (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  DeBerry v. Portuondo, 403 F.3d 57, 66 (2d Cir. 2005) (citing 28 U.S.C. § 2254(d)).  AEDPA also requires that in any such proceeding "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see also DeBerry, 403 F.3d at 66; Boyette v. LeFevre, 246 F.3d 76, 88 (2d Cir. 2001).

A state court decision violates the "contrary to" clause of section 2254(d)(1) when it "reaches a result opposite to the one reached by the Supreme Court on the same question of law or arrives at a result opposite to the one reached by the Supreme Court on a 'materially indistinguishable' set of facts.'"  Earley v. Murray, 451 F.3d 71, 74 (2d Cir. 2006) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  A federal habeas court may only grant the writ under the "unreasonable application" clause of the section when the state court's decision "identifies the correct rule of law but applies that principle to the facts of the prisoner's case in an unreasonable way."  Earley, 451 F.3d at 74 (citing Williams, 529 U.S. at 413).  A federal court engaged in habeas review is not charged with determining whether the state court's determination was merely incorrect or erroneous, but instead whether such determination was "objectively unreasonable."  Williams, 529 U.S. at 409; see also Sellan v. Kuhlman, 261 F.3d

303, 315 (2d Cir. 2001).  Objectively unreasonable means "'some increment of incorrectness beyond error'" is required in order to grant a federal habeas application.  <u>Earley</u>, 451 F.3d at 74 (quoting <u>Francis S. v. Stone</u>, 221 F.3d 100, 111 (2d Cir. 2000)).

> ### *B.  Substance of Parker's Claims*

### 1. Ground One

In his first ground for relief, Parker argues that he received the ineffective assistance of counsel.  <u>See</u> Pet. (Dkt. No. 1), Ground One.

> #### *i.  Clearly Established Supreme Court Precedent*

In order to prevail on a claim of ineffective assistance of counsel within the framework established by the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), a habeas petitioner must satisfy a two-part test.  First, he must demonstrate that counsel's performance was so deficient that his attorney was not functioning as "counsel" within the meaning of the Sixth Amendment to the U.S. Constitution.  <u>Id.</u> at 688.  In other words, a petitioner must show that his attorney's performance "fell below an objective standard of reasonableness."  <u>Id.</u>  Second, a petitioner must show that counsel's deficient performance prejudiced him.  <u>Id.</u> at 694.  To establish the "prejudice" prong of the <u>Strickland</u> test, a petitioner must show that a "reasonable probability" exists that, but for counsel's error, the outcome of the trial would have been different.  <u>Id.</u>; <u>see also</u> <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003) ("the legal principles that govern claims of ineffective assistance of counsel" were established in <u>Strickland</u>).

The Supreme Court has also recognized that a court need not necessarily address both components of the <u>Strickland</u> inquiry; as that Court noted, "there is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant

makes an insufficient showing on one." Strickland, 466 U.S. at 697.

*ii.  Contrary To, or Unreasonable Application Of, Clearly Established*

*Supreme Court Precedent*

In support of his claim that his defense counsel rendered ineffective assistance, Parker argues that his trial attorney: (1) failed to object when the prosecutor vouched for the credibility of his witnesses; (2) did not move to have the verdict set aside due to insufficient evidence or based upon a claim that the verdict was against the weight of the evidence; (3) waived Parker's right to have a second Wade/Huntley hearing; (4) failed to argue that the testimony of the co-defendants was not sufficiently corroborated; (5) performed an inadequate pre-trial investigation; (6) did not claim that Parker was not advised of his Miranda warnings before he was questioned by law enforcement officers; (7) failed to object to the manner in which the prosecutor questioned Parker regarding his interaction with Investigator Moessner; and (8) did not object when the prosecutor knowingly allowed its witnesses to provide false and perjurious testimony. See Traverse (Dkt. No. 11) at 1-14.  Petitioner also appears to assert that the cumulative effect of counsel's errors amounted to a violation of Parker's Sixth Amendment right to effective counsel. Id. at 16.

These claims were raised by Parker in the state courts through his Supplemental *Pro Se* Appellate Brief.  See Supplemental Br. at 1-34.  The Third Department found these claims to be "without merit." Parker, 290 A.D.2d at 652.  This Court must, therefore, ascertain whether that finding is either contrary to, or represents an unreasonable application of, clearly established Supreme Court precedent.

14

## A.  Failure to Object to Prosecutorial Misconduct

Parker's Traverse does not clearly articulate the manner in which he now claims that the prosecutor improperly vouched for the credibility of his witnesses.  See Traverse (Dkt. No. 11) at 1.  In his Supplemental *Pro Se* Appellate Brief, however, Parker claimed that trial counsel failed to object when the prosecutor vouched for the credibility of his witnesses, and otherwise committed misconduct, during his summation.  See Supplemental Br. at 23-30.  Federal courts may properly look to the state court record where a *pro se* petitioner's submissions fail to reveal the factual underpinnings of a particular habeas claim.  See Gillis v. Edwards, 445 F. Supp.2d 221, 229 n.6 (N.D.N.Y. 2006) (McCurn, Senior D.J.) (citation omitted).  Therefore, this Court will presume that this aspect of Parker's habeas claim relates to the summation delivered by the prosecution.

The record, however, does not support Parker's claim that the prosecutor vouched for the credibility of his witnesses.  Rather, the comments cited by Parker in support of this claim appear to this Court to have been proper argument on the part of the prosecution, rather than impermissible vouching.  For example, the prosecutor could properly argue that Parker's accomplices accepted responsibility for their actions because they had entered into plea agreements prior to Parker's trial.  See Trial Tr. at 2077-78.  Referring to one of the prosecution witnesses as a "nice lady," see id. at 2081, does not constitute misconduct, and, contrary to Petitioner's claim, Supplemental Br. at 24, the prosecutor did not claim that Parker "looked like" a murder.  Rather, the prosecutor specifically cautioned the jury to **avoid** believing that any individual "looks like a murder," and instead argued that "no one knows what a murderer looks like."  Trial Tr. at 2085.  Furthermore, Petitioner is incorrect in arguing that the prosecutor

expressed his personal knowledge as to Parker's guilt.  Compare Supplemental Br. at 24 with

Trial Tr. at 2081.  Nor has Petitioner established that the other comments of the prosecutor

during his summation were inflammatory, disparaging to Parker's counsel, or otherwise

improper.[8]

In sum, the comments of the prosecutor during his summation were fair comment based

upon the evidence adduced at trial, and therefore not objectionable.  See United States v. Walker,

155 F.3d 180, 187 (3d Cir. 1998) (citing Lawn v. United States, 355 U.S. 339, 359 n.15 (1958))

(other citation omitted); Almonte v. People of State of New York, No. 07 CV 70, 2007 WL

1674167, at *3 (E.D.N.Y. June 7, 2007); United States ex rel. Haynes v. McKendrick, 350

F.Supp. 990, 996-97 (S.D.N.Y. 1972), aff'd, 481 F.2d 152  (2d Cir. 1973); see, e.g., United

States v. Smith, 778 F.2d 925, 929 (2d Cir. 1985) ("final arguments of counsel may be vigorous

and robust if based on the evidence in the record.").  Parker's trial counsel, therefore, did not

render ineffective assistance in failing to argue that the prosecutor engaged in misconduct in

delivering his summation at Parker's trial.

### B.  Failure to Challenge Adequacy of Evidence Adduced at Trial

Petitioner next faults counsel for failing to argue that the verdict was against the weight of

the evidence and/or not supported by legally sufficient evidence.  E.g., Pet. (Dkt. No. 1), Ground

One; Traverse (Dkt. No. 11) at 3; see also Supplemental Br. at 31-34.

Substantial evidence which established Parker's guilt of the charged crimes, however,

was presented at trial.  Specifically, both Blount and Abdul-Hameed implicated Parker in the

_____

[8]  Parker's claim that the prosecutor improperly shifted the burden of proof to Parker
during his closing argument is not supported by the record.  Compare Supplemental Br. at
26-28 with Trial Tr. at 2125-31.

robbery and related crimes concerning Amador, and those men, as well as McQueen, provided testimony that established Parker's complicity in Green's murder and the crimes related to that homicide.  See Trial Tr. at 1019-25, 1047-58, 1308-15, 1766-72, 1822-29.  Chemical analysis of blood found in the car the perpetrators used to flee the crime demonstrated that such blood was consistent with that of Green, id. at 1929, and blood consistent with that belonging to both Green and Parker was found on pants Parker admitted to wearing the day the victim was killed.  Id. at 1550-51; 1919-20.[9]  Additionally, Fournier overheard Parker discuss his plan to rob a "weed spot" the day Amador and Green were robbed, id. at 1732, and Flanders testified that later on that same day, she observed Parker with a wad of money,[10] and overheard a group of men that included Parker boasting about recently committing a robbery at a drug house.  Id. at 1211-16. She also noticed that Parker was nervously pacing around in her apartment after Green was killed, id. at 1219, and testified that he had offered her $1000.00 if she agreed to falsely state that he was with her the evening and night of March 20, 1996.  Id. at 1227-28.  Moreover, Fournier testified that she overheard Parker plan to leave for the Gloversville area after committing the robbery, id. at 1735, the location where the perpetrators ultimately fled after committing the crimes.  Id. at 1320-21.

In light of the foregoing, trial counsel properly refrained from arguing that the jury's verdict was against the weight of the evidence, or, alternatively, that there was legally insufficient

---

[9]  When Investigator Moessner asked Petitioner if he had sustained a cut on his leg around the time of Green's death, Parker responded that he had not been cut and further declared that had he not been with anyone who was bleeding around that time.  Trial Tr. at 1551.

[10]  Flanders testified that prior to March 20, 1996, she never saw Parker with any money.  Trial Tr. at 1209.

evidence adduced at trial to establish Parker's guilt.[11]

### C. Failure to Argue Lack of Corroboration

Advancing to Parker's claim that counsel wrongfully failed to argue that the testimony of

Parker's co-defendants was not sufficiently corroborated,[12] the Court notes that under the CPL:

> A defendant may not be convicted of any offense upon the
> testimony of an accomplice unsupported by corroborative evidence
> tending to connect the defendant with the commission of such
> offense.

See CPL § 60.22 (1).  This law provides that the corroborative evidence "connect the defendant

with the commission of the crime to be proven, not . . . prove [he] committed it."  Longtin v.

Walker, 99-CV-2182, slip op. at 27 (N.D.N.Y. Feb. 25, 2004) (Sharpe, D.J.) (quoting People v.

Smith, 55 N.Y.2d 945, 946 (1982) (other citation omitted)).

In discussing this corroboration requirement, New York's Court of Appeals has observed

that: "[t]he corroborative evidence need not establish all the elements of the offense[;]

[s]eemingly insignificant matters may harmonize with the accomplice's narrative so as to provide

the necessary corroboration."  People v. Breland 83 N.Y.2d 286, 292-93 (1994) (internal

---

[11]  In New York, the standard for determining the legal sufficiency of evidence "is
whether, after viewing the evidence in a light most favorable to the prosecution, any rational
trier of fact could have found the essential elements of the crime beyond a reasonable
doubt."  People v. Carthrens, 171 A.D.2d 387, 392 (N.Y. App. Div. 1st Dep't. 1991) (citing
Jackson v. Virginia, 443 U.S. 307, 319 (1979) (other citations omitted)).  By contrast, weight
of the evidence review "requires the appellate court, viewing the evidence in a neutral light,
to make its own independent determination as to the 'relative probative force of conflicting
testimony and the relative strength of conflicting inferences that may be drawn from the
testimony.'"  Carthrens, 171 A.D.2d at 392 (quoting People v. Bleakley, 69 N.Y.2d 490, 495
(1987)).

[12]  Parker's ineffectiveness claim relating to counsel's waiver of a second suppression
hearing is addressed by this Court in conjunction with Parker's second ground for relief.

quotations and citations omitted).  Significantly, "[i]n assessing corroborative evidence, 'proof of the elements of the crimes is not the determinative template . . . and much less evidence and of a distinctly inferior quality is sufficient to meet the slim corroborative linkage to otherwise independently probative evidence from accomplices.'"  Nova v. Ercole, No. 06 Civ. 562(NRB), 2007 WL 1280635, at *4 (S.D.N.Y. Apr. 30, 2007) (quoting Breland, 83 N.Y.2d at 294) (other citation omitted).

As noted above, in addition to the testimony of Parker's accomplices, witnesses for the prosecution established the following facts which were strongly suggestive of Parker's guilt: (1) trace amounts of blood consistent with that belonging to Green were found in the car Parker used when leaving the scene of the crime; (2) the blood of both Green and Parker was found on Parker's jeans; (3) Fournier overheard Parker discuss his plan to rob a home that sold marijuana the day of the crimes; (4) later that same day, Flanders observed Parker with a quantity of money and overheard a group of men (including Parker) discussing their recent robbery of a drug house; (5) Parker offered Flanders $1000.00 to provide Parker with a false alibi; and (6) after the crimes, Parker fled to Gloversville, the precise location to which Fournier testified Parker declared he would travel after the robbery.  That evidence, particularly when viewed in combination with the evidence which established that the location of the shell casings in the apartment in which Green was killed was inconsistent with Parker's statement to law enforcement agents as to where he was located at the time Green was shot, but entirely consistent with him having shot the victim, see Trial Tr. at 1621-23, clearly surpassed the relatively modest corroboration hurdle posed by CPL § 60.22(1).  Therefore, Parker's trial counsel did not render ineffective assistance in failing to argue that the testimony of the accomplices of Parker was not sufficiently corroborated.

### D.  Inadequate Investigation

Parker next contends that his trial counsel rendered ineffective assistance by failing to adequately prepare Parker's defense to the charges against him.  In support of this contention, Parker argues that if counsel had conducted an adequate investigation, he would have learned that the evidence at the crime scene was inconsistent with the trial testimony provided by the accomplices.  See Traverse (Dkt. No. 11) at 2-5.  He further argues that Flanders could not have seen Parker in her bathroom holding the wad of cash about which she testified, id. at 5-6, and generally asserts that counsel did not properly investigate the evidence upon which his prosecution was based.  Id. at 10.

Petitioner's argument that counsel failed to adequately prepare for Parker's trial is premised in large part on his claims that the prosecution witnesses testified falsely and/or inconsistently with one another.  Specifically, he argues that: (1) Fournier's testimony was "false and inconsistent," id. at 2; (2) McQueen's testimony contradicted the testimony provided by the other accomplices as well as Fournier, id.; (3) the evidence presented by the prosecution that Parker pistol-whipped Amador was "false," id.; the prosecution's evidence was replete with "lies, inconsistencies and contradictions as well as manipulated evidence," id. at 3; (4) the testimony of the co-defendants was "inconsistent [and] untrustworthy," id.; (5) Blount's testimony was false, "unbelievable and untrustworthy," id.; (6) the crime scene evidence was inconsistent with the "false testimony that was concocted" by Parker's accomplices, id. at 5; (7) Investigator Moessner "tampered" with Parker's statement, id.; (8) the testimony of McQueen and Blount contradicted the testimony provided by Flanders, id. at 6; and (9) Abdul-Hameed's testimony contradicted the testimony provided by McQueen, id. at 7.

20

These claims, however, fail to acknowledge the fact that "[i]t is the jury's function to resolve inconsistencies present in the evidence and to determine which evidence it will credit." People v. Johnson, 24 A.D.3d 967, 968 (N.Y. App. Div., 3d Dep't. 2005); People v. Cotto, 189 A.D.2d 707, 707 (N.Y. App. Div., 1st Dep't. 1993) (inconsistencies in testimony "were for the jury to resolve"); see also Quartararo v. Hanslmaier, 186 F.3d 91, 95-96 (2d Cir. 1999) (federal habeas courts must not assume "the position of a thirteenth juror;" "inconsistencies [are] for the jury to resolve," not the district court).

Parker has submitted nothing short of pure surmise which demonstrates that had trial counsel performed a more thorough pretrial investigation, the jurors would have been more aware of the claimed inconsistencies in the prosecution witnesses' testimony.[13]  Moreover, Parker has not substantiated the claims he had raised in support of this aspect of his motion.  For example, Parker offers no evidence that supports his claim that it was "impossible" for Flanders to observe Parker holding a wad of bills in her bathroom, and such claim appears to be highly suspect in light of that witness's testimony that she was walking by her bathroom at that time while the door to that room was open.  See Trial Tr. at 1215-16.  Nor has Parker offered any evidence that substantiates his claim, see Traverse (Dkt. No. 11) at 7, that Flanders' testimony regarding his attempt to create a false alibi was anything other than truthful.  Moreover, although Parker now claims that his trial attorney "did not investigate the full facts of the evidence that [the] prosecution used at trial," id. at 10, the Court notes that prior to trial, Parker's counsel filed

_____

[13]  Parker himself conceded in his Supplemental *Pro Se* Appellate Brief that his trial attorney "made appropriate motions and objections during the course of the trial," and "vigorously cross-examined some of [Parker's] co-defendant witnesses, and strenuously argued [Parker's] position to the jury."  See Supplemental Br. at 2.

a comprehensive omnibus motion.  See Record on Appeal at R32-38.  After the County Court

ruled on that application, id. at R172-74, counsel filed a motion that sought: (1) the dismissal of

all charges brought against Parker; (2) an order directing the prosecution to provide defense

counsel with all Brady and Rosario material in its possession; (3) a court order suppressing all

statements made by Parker to law enforcement officials; (4) the scheduling of pretrial Huntley

and Molineux hearings and (5) the suppression of any identification testimony.  Id. at R184-92.

Additionally, as noted above, Parker's trial counsel actively participated in the pretrial hearing

over which Judge Harrigan presided on September 13, 1996.  Furthermore, the trial transcript

establishes that defense counsel thoroughly cross-examined the prosecution's witnesses and

lodged appropriate objections during the course of Parker's trial – conduct that strongly suggests

that counsel had adequately prepared for Petitioner's trial.[14]

     "A petitioner's 'bald assertion that counsel should have conducted a more thorough

pretrial investigation fails to overcome the presumption that counsel acted reasonably.'"

Campbell v. Greene, 440 F. Supp. 2d 125, 149 (N.D.N.Y. 2006) (McCurn, Senior D.J.) (quoting

Atkinson v. United States, No. 05-CV-286, 2005 WL 3555946, at *7 (N.D.N.Y. Dec. 28, 2005)

(McAvoy, Senior D.J.) (other quotations and citations omitted).  Since Petitioner's claim that his

trial counsel did not adequately prepare a defense for Parker is squarely contradicted by the state

court record, this theory does not support his claim alleging ineffective assistance.

### E.  Failure to Challenge Voluntary Nature of Statements to Police

     Petitioner next seems to claim that his trial attorney wrongfully failed to object at trial to

---

[14]  At the conclusion of Petitioner's trial, the County Court specifically complimented both the prosecutor and defense counsel "for the able manner in which each of them ... represented their client."  Trial Tr. at 2183-84.

the admission into evidence of Parker's statements to, and interactions with, Investigator

Moessner.  Traverse (Dkt. No. 11) at 8.  In a related claim, Parker argues that counsel wrongfully

conceded Parker's guilt of the robbery charges in the Superceding Indictment.  See Supplemental

Br. at 19-22.

However, it is clear that counsel attempted to use Parker's statements to law enforcement

agents as proof that Parker had cooperated with the police during the criminal investigation

below.  During counsel's cross-examination of Investigator Moessner, Petitioner's attorney

elicited testimony which demonstrated that Parker had cooperated with the police, admitted his

complicity in the robberies but denied killing Green.  See Trial Tr. at 1599-1609.  Defense

counsel reiterated this theme in his summation, when he noted that Parker had provided a

detailed account of his actions on the night of March 20, 1996 to Investigator Moessner, had

made "no bones" about his involvement in the robberies but consistently denied shooting Green.

Id. at 2062-63.

Courts have held that it is a reasonable strategy for a trial attorney to concede his client's

guilt as to certain crimes in the hopes of obtaining an acquittal on more serious charges in an

indictment.  See Farrington v. Senkowski, 214 F.3d 237, 244 (2d Cir. 2000) (sound trial strategy

where defense counsel conceded defendant's guilt of certain crimes in an effort "to persuade the

jury to acquit on the more serious charges") (citing Strickland, 466 U.S. at 690); Brown v. Rick,

No. 01 CIV.4310 DC, 2003 WL 22801397, at *5 (S.D.N.Y. Nov. 25, 2003) (conceding

petitioner's guilt of one crime while contesting guilt as to other charge constituted "a reasonable

tactical decision"); Nunez v. Miller,  No. 00 CIV 0966(ERK), 2001 WL 1773731, at *7

(E.D.N.Y. July 12, 2001) ("ample strategic reason" existed for defense counsel's concession that

his client committed lesser included offense).

Counsel's use at trial of Parker's statements to the police, as well as counsel's concession of Petitioner's guilt of the robbery charges, was clearly part of counsel's trial strategy of defending Parker against the most serious charges brought against him in the Superceding Indictment, including the first degree murder charge.  This theory, therefore, does not support Parker's ineffectiveness claim.

### F.  Failure to Object to False Testimony

Parker also contends that by the conclusion of his trial, his attorney "realize[d] that the prosecutors [sic] evidence was false as well as . . . tainted," but that counsel nevertheless "failed to protect [Parker's] defense by asking for a mistrial on insufficient evidence."  Traverse (Dkt. No. 11) at 14.

However, other than the fact that the version of events about which the prosecution witnesses testified is substantially different from the statements now offered by Parker as to what transpired on the evening and night of March 20, 1996, he has failed to demonstrate that any of the testimony at his criminal trial was false or perjurious.  Petitioner has failed to provide the Court with any evidence, other than his self-serving statements, that supports his claim that the prosecutor elicited false testimony at Parker's trial.[15]  Since he has not established that false or perjurious testimony was admitted into evidence at his trial, he has failed to demonstrate that counsel rendered ineffective assistance in failing to move for a mistrial based upon the purported admission of such testimony.

---

[15]  Petitioner's claim regarding counsel's failure to argue that there was insufficient evidence adduced at trial to establish Parker's guilt has already been addressed by this Court in Section II (B)(1)(ii)(B) of this Memorandum-Decision and Order.

### G.  Cumulative Effect of Claimed Errors

Petitioner additionally appears to assert that the cumulative effect of his trial attorney's errors also establishes that such counsel rendered ineffective assistance and deprived him of a fair trial.  See Traverse (Dkt. No. 11) at 16.

In light of the Court's finding that all of the theories advanced by Petitioner in support of his ineffective assistance claim are without merit, his claim that the cumulative effect of such errors entitles him to habeas intervention must also fail.  See, e.g., Nicholas v. Smith, No. 02 CV 6411(ARR), 2007 WL 1213417, at *16 (E.D.N.Y. 2007); Shepherd v. Portunda, No. 99-CV-1866 (JBW), 2003 WL 22964538, at *9 (E.D.N.Y. Nov 10, 2003) ("Trial counsel's alleged errors, whether considered individually or cumulatively, did not deprive petitioner of constitutionally ineffective assistance of counsel meriting habeas corpus relief"); White v. United States, No. 99 CIV. 11809, 2000 WL 546426, at *6 (S.D.N.Y. May 4, 2000) ("[p]etitioner further maintains that the cumulative effect of the errors asserted above deprived him of a fair trial. Because all of [petitioner's] earlier points have been rejected, this point must be rejected as well").

In sum, Parker has not established that he received the ineffective assistance of trial counsel.  He has therefore failed to establish that the Third Department's decision rejecting this aspect of his appeal, see Parker, 290 A.D.2d at 652, is either contrary to, or represents an unreasonable application of, Strickland and its progeny.  Parker's first ground for relief, therefore, is denied.

### 2.  Ground Two

In his second ground, Parker asserts that he was deprived of his constitutional right to be

present at all material stages of his trial.  Pet. (Dkt. No. 1) at Ground Two.  Specifically, he

alleges that his trial attorney and the prosecutor engaged in a "private discussion," after which his

counsel agreed to waive Parker's right to a second suppression hearing.  Id.  Petitioner asserts

that as a result, he was wrongfully deprived of his right to "give relevant testimony," and to

provide argument in support of his request to suppress certain evidence, including his statements

to the police.  Id.

### i.  Clearly Established Supreme Court Precedent

It is well settled that a criminal defendant's presence at trial is required "to the extent that

a fair and just hearing would be thwarted by his absence."  Snyder v. Massachusetts, 291 U.S. 97,

107-08 (1934), overruled on other grounds by Malloy v. Hogan, 378 U.S. 1 (1964); see Illinois v.

Allen, 397 U.S. 337, 338 (1970).  This guarantee encompasses the right "to be present at all

stages of the trial where his absence might frustrate the fairness of the proceedings," Faretta v.

California, 422 U.S. 806, 819 n.15 (1975), and assures that an accused may even attend hearings

in which he is not actually confronting witnesses or evidence against him.  See Kentucky v.

Stincer, 482 U.S. 730, 745 (1987); United States v. Gagnon, 470 U.S. 522, 526 (1985) (per

curiam).  This right stems from an individual's Sixth Amendment right to confront witnesses, as

well as his due process right to attend hearings in which he is not actually confronting witnesses

or evidence against him.  See Stincer, 482 U.S. at 745.  As the Supreme Court has recognized,

however, the right to be present is not absolute; it is triggered only when the defendant's

"presence has a relation, reasonably substantial, to the fu[l]lness of his opportunity to defend

against the charge."  Snyder, 291 U.S. at 105-06.  Thus, there is no constitutional right to be

present when the defendant's presence "would be useless, or the benefit but a shadow."  Snyder,

291 U.S. at 106-07.

Additionally, in <u>Jones v. Barnes</u>, 463 U.S. 745 (1983), the United States Supreme Court recognized that criminal defendants have "the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." <u>Id.</u> at 751 (citing <u>Wainwright v. Sykes</u>, 433 U.S. 72, 93 n.1 (1977)). Where a fundamental right of the defendant is implicated, due process mandates that he personally make an informed waiver of such right. <u>New York v. Hill</u>, 528 U.S. 110, 114 (2000) (citing <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464-465 (1938)). All other rights, however, may be waived by counsel because "'the lawyer has – and must have – full authority to manage the conduct of the trial.'" <u>Hill</u>, 528 U.S. at 115 (quoting <u>Taylor v. Illinois</u>, 484 U.S. 400, 417-418 (1988)). Thus, decisions by counsel pertaining to the conduct of the trial, such as "what arguments to pursue, . . . what evidentiary objections to raise, ... and what agreements to conclude regarding the admission of evidence" may properly be made by counsel and bind his client. <u>Hill</u>, 528 U.S. at 115 (citations omitted).

*ii.  Contrary To, or Unreasonable Application Of, Clearly Established*

*Supreme Court Precedent*

The Third Department rejected Parker's claim that his trial attorney wrongfully waived Parker's right to a second suppression hearing, opining that:

> To be sure, criminal defendants retain authority over various fundamental decisions pertaining to their case. With respect to strategic and tactical decisions concerning the conduct of trials, by contrast, defendants are deemed to repose decision-making authority in their lawyers. Said differently, by accepting counseled representation, a defendant assigns control of much of the case to the lawyer, who, by reason of training and experience, is entrusted

> with sifting out weak arguments, charting strategy and making
> day-to-day decisions over the course of the proceedings. The
> decision to forego a duplicate suppression hearing as superfluous is
> precisely the type of day-to-day decision making over which an
> attorney, in his or her professional judgment, retains sole authority.

Parker, 290 A.D.2d at 651-52 (internal quotations and citations omitted).

This Court, therefore, is charged with ascertaining whether that decision is either contrary

to, or represents an unreasonable application of, the above-referenced Supreme Court precedent.

The Court initially finds any claim that Parker was denied his right to be present at a

material stage of his trial to plainly be without substance. Although Parker states that he was not

present at a "private discussion" between his counsel and the prosecutor, he never claims that the

trial judge was present at that meeting. Additionally, the record reflects that Parker was clearly

aware of the decision made by counsel to forego a second suppression hearing, and that he voiced

no objection to that strategic decision of his counsel. Specifically, the transcript of a June 17,

1997 hearing before the County Court reflects the following exchange between that court,

Parker's counsel, and the prosecutor concerning the issue of whether or not a second Wade /

Huntley would be held:

| | |
|---|---|
| THE COURT: | Good morning. |
| MR. MUELLER: | Good morning, your Honor. |
| THE COURT: | This matter is scheduled today for a Huntley and Wade hearing this morning. |
| MR. KINDLON: | That's correct, your Honor. I can speak to this issue if it's permissible. |
| MR. MUELLER: | Please. |
| MR. KINDLON: | Your Honor, my client was initially indicted |

on an indictment charging, among other things, murder in the Second Degree, and during the pendency of that initial prosecution, Huntley and Wade hearings were duly conducted and concluded, and in fact there has been a decision rendered by Judge Harrigan.  Between the commencement of the prosecution and the present time there was a superseding indictment which charged in its top count Murder in the First Degree, and new motions were interposed and Huntley and Wade hearings were ordered.

Mr. Mueller and I have had occasion to go through the [CPL §] 710.30 notices and the other relevant facts and circumstances of the case, and we have determined that there are no new issues to be determined in the Huntley and Wade hearing which was ordered by the Court pursuant to the motions that were filed after the superseding indictment.  Consequently, there's really no necessity to conduct a hearing, and we are here this morning to affirm that on the record.

THE COURT:          Mr. Mueller?

MR. MUELLER:        All of that is correct, your Honor....

* * * * *

THE COURT:          Anything else for the record?

MR. MUELLER:        One thing, your Honor.  I think that in fairness I will provide to Mr. Kindlon in advance of the trial whatever materials in the nature of Rosario would have been provided to him had we gone through a second or repetitive Huntley and Wade hearing....

THE COURT:          That's very sensible.

29

(There was discussion off the record between Mr. Kindlon and
the defendant.)

MR. KINDLON:        We're all set, Judge.

See Resp. App. at RA21-27.

The foregoing conclusively establishes that Parker: (1) was aware of his attorney's

decision to waive the second hearing; (2) heard the reasons for counsel's strategic decision to

forego that hearing; (3) had a discussion with his attorney after the decision to waive the

hearing was placed on the record but before that hearing concluded; and (4) voiced no objection

to his attorney's decision to waive the second hearing.  Thus, his claim that he not present for

the material stage in his proceeding where that hearing was waived is squarely contradicted by

the record.

Moreover, Petitioner's argument that his trial attorney improperly waived that hearing

without Parker's consent,[16] see Petition, Ground Two, appears to overlook the fact that the

Second Circuit has specifically noted that "defense counsel may waive on behalf of defendant .

. . strategic and tactical matters such as the selective introduction of evidence, stipulations,

objections and pre-trial motions."  United States v. Plitman, 194 F.3d 59, 63 (2d Cir. 1999)

(defense counsel could properly waive client's Sixth Amendment right of confrontation); see

also Key v. Artuz, No. 99-CV-161, 2002 WL 31102627, at *7 (E.D.N.Y. Sept. 16, 2002)

(decision to withdraw motion to suppress videotaped statement was a tactical decision that

could properly be made by defense counsel alone).

---

[16]  Of course, Parker's consent to counsel's decision to waive the hearing could
properly be inferred by his failure to voice any objections at the June 17, 1997 hearing before
the County Court.  E.g. Maula v. Freckleton, 972 F.2d 27, 29 (2d Cir. 1992) (petitioner's
consent "could . . . be properly inferred from [petitioner's] failure to object").

In the criminal matter below, trial counsel noted that there were no new issues to be resolved if a second <u>Wade</u>/<u>Huntley</u> hearing were held, Resp. App. at RA21, a characterization with which the prosecutor agreed.  <u>Id.</u> at RA23.  The prosecutor described the proposed second hearing as "repetitive," <u>id.</u> at RA27, and the Third Department characterized that hearing as both "duplicat[ive]" and "superfluous."  <u>Parker</u>, 290 A.D.2d at 651.

The record firmly establishes that trial counsel properly waived Parker's right to conduct the second suppression hearing.  That stipulation of counsel – of which Parker was plainly aware and to which he voiced no objection – was entirely appropriate in light of the relevant facts and circumstances, and in no way infringed on, or otherwise violated, Parker's constitutional rights.  He, therefore, cannot establish that the Third Department's decision denying this aspect of his appeal is either contrary to, or represents an unreasonable application of, the Supreme Court precedent noted above.  His second and final ground for relief, therefore, is denied.

Accordingly, it is hereby

**ORDERED**, that Parker's Petition (Dkt. No. 1) is **DENIED** and **DISMISSED**; and it is further

**ORDERED**, that the Clerk of Court serve a copy of this Order on the parties.

**IT IS SO ORDERED.**

Dated:       July 17, 2007
             Albany, New York

Lawrence E. Kahn
U.S. District Judge

31